181 So.2d 323 (1965)
Lillie LaFLEUR, Plaintiff and Appellant,
v.
Eraste GUILLORY, Defendant and Appellee.
No. 1594.
Court of Appeal of Louisiana, Third Circuit.
November 30, 1965.
Rehearing Denied January 11, 1966.
*324 Daniel J. McGee, Mamou, for plaintiff-appellant.
Tate & Tate, by Paul C. Tate, Mamou, and Roland B. Reed, Ville Platte, for defendant-appellee.
Before TATE, SAVOY and CULPEPPER, JJ.
CULPEPPER, Judge.
Lillie LaFleur sues her former husband, Eraste Guillory, to be recognized as the owner of an undivided one-half interest in approximately 95 arpents of land and 25 head of cattle, allegedly acquired by the *325 community of acquets and gains formerly existing between them. She also prays for an accounting and partition of the property. From a judgment rejecting her demands, plaintiff appeals.
The substantial issue concerns the conveyance by sale, and mortgage of the subject property, during the existence of the community, by one Rene Andrus to Wilbur Guillory, son of the defendant, and a "counter letter" executed by Wilbur Guillory at the same time, declaring that the property was purchased "* * * in his name for the convenience of the actual owner of the property and the obligor for the balance due, Eraste Guillory, * * *"
The general facts show that plaintiff and defendant were married in 1946 and ceased living together in 1957. On April 8, 1958 plaintiff sued defendant for a separation from bed and board on the grounds of abandonment. On April 18, 1958, before the judgment of separation was signed, and while the community still existed,[1] Rene Andrus, a cousin of defendant, conveyed the subject property to Wilbur Guillory, son of defendant, by an act of sale and mortgage. The stated consideration was $8,000, $2,300 cash and $5,700 represented by one promissory note to be paid in 15 annual installments of $380 each. At the same time, and as part of the same transaction, Wilbur Guillory and Eraste Guillory executed the instrument referred to as a "counter letter", which reads as follows:
"BEFORE ME, the undersigned authority, personally came and appeared WILBUR D. GUILLORY who declared that the property purchased this date from Rene Andrus was placed in his name for the convenience of the actual owner of the property and the obligor for the balance due,
ERASTE GUILLORY, widower, a resident of Evangeline Parish, Louisiana here present and joining in said stipulation."
The act of sale and mortgage from Rene Andrus to Wilbur Guillory was recorded on April 21, 1958, but the counter letter was held in the possession of Eraste Guillory and was not recorded until several years later.
On April 29, 1958 the judgment of separation from bed and board was signed, dissolving the community of acquets and gains between plaintiff and defendant as of that date. On May 5, 1958 plaintiff and defendant entered into an act of partition of the declared community property, whereby plaintiff received a small residential lot in the town of Mamou and defendant received a 1957 Ford automobile. The property which is the subject of the present suit was not mentioned in this act of partition.
On April 7, 1961 Rene Andrus died, leaving by testament to Eraste Guillory all of his property, including the $5,700 mortgage note hereinabove referred to.
On May 7, 1961 Wilbur Guillory died, leaving as his sole heirs his father, Eraste Guillory, and a sister, Mrs. June Guillory Vidrine. This sister executed an instrument of date, June 22, 1961, declaring "* * * I take cognizance of the counter letter given by my brother, Wilbur D. Guillory, to my father, Eraste P. Guillory, and I acknowledge that it reflects the actual circumstances relating to the hereinafter described property * * *" The property described therein is the 95 arpents in question, to which Mrs. June Guillory Vidrine states she makes no claim and quitclaims all of her interest to her father.
*326 On June 24, 1961 the quitclaim from Mrs. June Guillory Vidrine and the counter letter from Wilbur Guillory were recorded.
On June 19, 1964 plaintiff, Lillie LaFleur, was asked to sign a quitclaim to the subject property. She contacted her attorney and on investigation discovered for the first time the previously recorded counter letter. This suit followed.
The essential issue is the nature and effect of the so-called "counter letter". Plaintiff contends title vested in defendant on the date the act of sale and mortgage, and the counter letter, were executed, i. e., April 19, 1958 and hence that the property fell into the then existing community. LSA-C.C. Articles 2334, 2402 and 2405. Plaintiff calls attention to the well established jurisprudence that the acquisition of real property, in the name of the husband, during the marriage, creates a presumption in favor of the community, juris et de jure, unless the deed contains the double declaration that the property is acquired with separate funds of the husband, for his separate estate. See Succession of Hemenway, 228 La. 572, 83 So.2d 377 and the many authorities cited therein.
On the other hand, although defendant has made several alternative defenses, his primary contention is that the act of sale and concurrent counter letter did not vest title in Eraste Guillory at the time they were executed, or at any other time but, instead, that Eraste Guillory acquired this property in 1961 by inheritance from his son, Wilbur Guillory, and by quitclaim from his daughter, Mrs. June Guillory Vidrine.
Planiol, Traite Elementaire De Droit Civil, An English Translation By The Louisiana State Law Institute, Vol. 2, Part 1, in discussing simulation, makes the following relevant observations:
"1186. Definition
"There is simulation when one makes an apparent contract, the effects of which are modified or suppressed by another agreement, contemporaneous with the first and intended to remain secret. That definition, therefore, presupposes that there is identity of parties and of the object between the ostensible and the secret act. The secret act is called `counter-letter.'"
"1189. Simulation by Employment of Third Person
"In the cases above indicated the simulation bears only on the act made by the parties, either as to its very existence, its nature, or its conditions. Often also a person wishes to make a contract for his own account without the knowledge of third persons or without letting the third person know of his interest in the transaction. He then employs a mandatary who does not avow his quality and who appears as author and beneficiary of the act, as buyer or donee, etc., although the act does not concern him. There is in such case `interposition' of persons, or the employment of a prete-nom. It is another kind of simulation which does not affect the nature or the conditions of the act, but the persons who take part in it. It is treated later on in Nos. 2266 et seq."
"2266. Definition
"Mandate is an ostensible contract, whereby the person who employs an intermediary makes himself known, so that the act is made in his name; in the contract of commission, the personality of the principal becomes a matter of indifference to third persons, who are fully guaranteed by the personal responsibility of the commission agent with whom they transact, but they know, nevertheless, that the commission agent does not act on his own account, and that there is someone behind him who gives orders and for whose account the transaction is made. It may be that the person who employs another to look after his affairs wishes *327 to make third persons believe that the intermediary is the veritable interested party; not only does he wish to conceal his name from them but he also wishes to keep them from knowing that any person other than the apparent beneficiary is interested. It is then said that the intermediary acts as a `pretenom' or that he lends his name to his principal; the mandate is entirely concealed, since it is kept secret; nothing reveals to third person that the `pretenom' or undisclosed mandatary acts for another."
In the case of Peterson v. Moresi, 191 La. 932, 186 So. 737 (1939) our Supreme Court was concerned with a factual situation very similar to the present. Defendant there purchased 7 acres of land in his own name and, at the same time, executed a separate instrument recognizing plaintiffs as owners of certain fractional interests and agreeing to convey said interests to plaintiffs on request. After defendant, A. P. Moresi, died, plaintiffs sued to be recognized as owners of their respective fractional interests. The principal defense was that the so-called counter-letter did not convey title at the time of its execution, but instead was only an executory contract, such as an offer to sell. The court held the intrument was not an executory contract and, further, that an additional conveyance by defendant to plaintiffs of their respective interests in the property was not essential. The reasoning of the court is as follows:
"The instrument on which this suit is founded is neither a sale nor an offer to sell; it does not purport to be a transfer of title, or a promise on the part of A. P. Moresi to transfer title from him to the other persons named in the instrument. The instrument is merely an acknowledgment by A. P. Moresi that he bought the land for himself and as the agent for the other persons named in the instrument, and that they paid the price in proportion to the interests which they acquired, and hence that they all owned the property jointly and in the proportions stated in the instrument. A. P. Moresi's expression of willingness to execute an act of transfer if or when requested so to do was deemed proper because the title apparently stood in his name; but this expression of willingness to execute an act of transfer was not hampered with any condition, or coupled with any obligation to be performed by any one who might request an act of transfer. The instrument is more of the character of a counter letter than of any other instrument that has been suggested. It is pointed out in the brief for the appellees that the agency of A. P. Moresi, which was not disclosed in the sale made to him by McFarlain, was what the French jurists and commentators call pre te-nom,meaning one who lends his name. Spiers & Surenne's French Pronouncing Dictionary (1867); Heath's Standard French and English Dictionary; Baudry-Lacantinerie, vol. XXIV, p. 465, no. 880."
In the present case, we think the counter-letter, i. e., the secret instrument modifying the apparent recorded act of sale and mortgage, is a classic example of "prete-nom", as that term is explained in the above authorities. Eraste Guillory freely admitted that the reason he could not be named as vendee in the act of sale and mortgage was that he was "having trouble with my divorce, my wife". He admitted that if he had not been having trouble with his wife, he would have purchased the property in his own name. Thus, the purpose of the "prete-nom" was to deceive Lillie LaFleur, a third party to the transaction. This situation is recognized in Planiol, Traite Elementaire De Droit Civil, An English Translation By The Louisiana State Law Institute, Vol. 2, Part 2, No. 2268(2) as follows:
"The `prete-nom' can be employed to permit the principal to do an act which he would not be permitted to do ostensibly.

*328 In this case the intervention of the `prete-nom' can be known to the other party; it is not the latter, therefore, whom they wish to deceive; it is a fraud on the law which is plotted, the object of which is to avoid a nullity or the claims of a third person."
Under the counter-letter, Wilbur Guillory was nothing more than a "prete-nom," i. e., one who lends his name. The counter-letter states in clear and unambiguous language that the property was purchased in the name of Wilbur D. Guillory "* * * for the convenience of the actual owner of the property and the obligor for the balance due, Eraste Guillory * * *" This was not a promise by Wilbur Guillory to transfer the property to Eraste Guillory at some future date on request or on the happening of some condition such as the payment of a loan. As between the parties, no further action was contemplated under the counter-letter. This is borne out by the fact that after Wilbur Guillory died, Eraste Guillory simply recorded the counter-letter as evidence of his ownership of the property. Also, Mrs. June Guillory Vidrine recognized the counter-letter as showing ownership in Eraste Guillory.
We conclude that the effect of the act of sale and mortgage and the contemporaneous counter-letter was to vest title in Eraste Guillory as of the date of execution of those two instruments, i. e., April 18, 1958. The community of acquets and gains between plaintiff and defendant was still in existence on that day. Hence the property fell into the community.
In view of the conclusion which we have already reached, it is unnecessary for us to discuss all of the many arguments which defendant has made. We will mention those we think necessary.
Defendant cites Karcher v. Karcher, 138 La. 288, 70 So. 228 (1915) in which our Supreme Court defined a counter-letter to be:
"`An agreement to reconvey where property has been passed by absolute deed with the intention that it shall serve as security only. A defeasance by a separate instrument.' Bouvier."
Under this definition of a counter-letter, defendant argues the instrument in question here was nothing more than an agreement to convey the property to Eraste Guillory at some future time. We think it is obvious that the Karcher case involved only one type of counter-letter. The secret instrument of "counter-letter, modifying or suppressing the apparent contract, may be used for different purposes, such as (1) a security device agreeing to reconvey the property after payment of a loan or the happening of some other condition, (2) recognizing that the apparent contract is a pure simulation, of no effect between the parties whatever, (3) recognizing that the true owner is someone other than the person named in the apparent contract, as in the case of prete-nom, or (4) changing the nature of the apparent contract, as by acknowledging that a sale is actually a donation. This is all made clear in Planiol, Traite Elementaire De Droit Civil, An English Translation By The Louisiana State Law Institute, Vol. 2, Part 1, Nos. 1186-1190. Louisiana jurisprudence also has involved different types of counter-letters. See Louis v. Garrison, La.App., 64 So.2d 254, Schwarz v. Friedenburg, La.App., 135 So.2d 371, Haggard v. Rushing, La.App., 76 So.2d 52.
Defendant argues that the 1962 amendment to LSA-C.C. Art. 155, providing that a judgment of separation dissolves the community as of the date the suit was filed, should be given retroactive effect. Citing Talbot v. Trinity Universal Insurance Co., La.App., 99 So.2d 811, defendant argues the 1962 amendment affects only procedural and not substantive rights. This argument has no merit. Under the decision in Tanner v. Tanner, supra, the community existing between plaintiff and defendant acquired title to this property on April 18, 1958. To hold that the 1962 amendment *329 divests the community of its ownership would clearly destroy this substantive right of ownership.
Having concluded the property was acquired by the community on April 18, 1958, when the instruments in question were executed, it is not necessary for us to discuss further defendant's argument that he acquired the property in 1961 by inheritance from his son, Wilbur Guillory, and by quitclaim from his daughter, Mrs. June Guillory Vidrine.
Defendant also argues that plaintiff is estopped by the partition of community property entered into on May 5, 1958. One answer to this argument is that knowledge, actual or constructive, of the real facts is essential to such an estoppel. Here plaintiff clearly had no knowledge in 1958 of the fact that the community owned the property in question. Actually, the real facts were concealed from her by defendant. The equitable doctrine of estoppel has no application here.
A considerable portion of the record, and of defendant's brief, is concerned with an attempt to show that considering the transaction as a whole, the intention of the parties and the equities of the case require a decision for Eraste Guillory. The circumstances urged are as follows: Eraste Guillory and his cousin, Rene Andrus, were reared together like brothers, in the Andrus home. The property fell to Rene Andrus by inheritance, but it was understood he would leave it by will to Eraste Guillory. On the occasion of this transaction in 1958, Rene Andrus needed money and offered to sell the property to Eraste Guillory. As noted above, Eraste said he could not take the property in his name at that time, because of the divorce proceedings with his wife. Hence the idea was conceived of purchasing the property in the name of Eraste's son, Wilbur Guillory.
The mechanics of the transaction were that an act of sale and mortgage was drawn from Rene Andrus to Wilbur Guillory for a consideration of $8,000, of which $2,300 was cash and $5,700 was represented by a note. Wilbur signed this note as maker and Eraste signed it as endorser. At the same time Wilbur Guillory executed a mortgage to the bank for $3,500. Part of this bank loan was used to pay Rene Andrus the cash portion of the purchase price and the balance was used to pay attorney's fees, etc. Both Wilbur and Eraste signed the face of this note. At the same time the counter-letter in question was executed, in which Wilbur Guillory declared that the property was purchased in his name for the convenience of the actual owner, and obligor for the balance due, Eraste Guillory.
We fail to see how defendant finds confort in either the intention of the parties or the equities of the case. The intention of the parties was that Rene receive his needed money and Eraste acquire the property in 1958, instead of waiting to acquire it by testament from Rene Andrus. The purpose of naming Wilbur as the purchaser and drawing the secret counter-letter was to conceal the true nature of the transaction from Lillie LaFleur. Hence, even if we were to consider the intention of the parties, or the equities of the case, as having any effect whatsoever on the legal effect of this counter-letter, it would not change our decision.
One of defendant's "alternative" averments is that if Lillie LaFleur is recognized as owner of a one-half interest in the property, and a partition thereof is ordered, he is entitled to reimbursement for any of his separate funds used to improve the property, pay the mortgages, taxes, etc. Of course, in the event of a partition, defendant can assert these or any other rights he has to reimbursement in accordance with law.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be *330 judgment herein in favor of the plaintiff, Lillie LaFleur, and against the defendant, Eraste Guillory, decreeing plaintiff to be the owner in common with defendant, in proportion of an undivided one-half to each, of the approximately 95 arpents of land and 25 head of cattle as described in plaintiff's petition, and this case is remanded to the district court for further proceedings in accordance with the views expressed herein. All costs thus far in the lower court, as well as the costs of this appeal, are assessed against the defendant appellee.
Reversed and remanded.
On Application for Rehearing.
En Banc. Rehearing denied.
NOTES
[1] Tanner v. Tanner, 229 La. 399, 86 So. 2d 80 (1956), holding that a judgment of separation dissolved the community as of the date of the judgment, and not as of the date on which the suit was filed, was the law until LSA-C.C. Art. 155 was amended by Act 178 of 1962, legislatively overruling the Tanner decision and providing that a judgment of separation dissolves the community retroactive to the date on which the suit was filed.