In the Matter of Helene ULRICH, wife of, and Albert J. Huddleston, Debtors.

David V. Adler, Trustee, Plaintiff,

v.

United States of America, through The Internal Revenue Service, Meghan Huddleston Delgiorno, Lindsay Huddleston Kersker, Kevin Doyle Huddleston, Alicia St. John Huddleston, and Continental Titles, Inc., through its Liquidator, Thomas P. Failla, Jr., Defendants.

Bankruptcy No. 88–10415.
Adversary No. 00–1023.

United States Bankruptcy Court, E.D. Louisiana.

March 20, 2002.

Elizabeth W. Magner, Esq., New Orleans, LA, Douglas S. Draper, New Orleans, LA, trustee.

Mary L. Dumestre, Jules Fontana, New Orleans, LA, Steven Gremminger, Washington, DC, Frank R. Nicotera, New Or-

leans, LA, Regina S. Wedig, New Orleans, LA, for creditors.

Ronald J. Hof, New Orleans, LA, for debtors.

Albert J. Huddleston, Kenner, LA, pro se.

### MEMORANDUM OPINION

THOMAS M. BRAHNEY, III, Chief Judge.

This matter came before the Court on the Objection to Claim, Complaint and Request for Issuance of Writ of Sequestration and Attachment filed by the Chapter 7 Trustee, David Adler. Many of the issues of the Complaint have been addressed in previously entered Orders and Judgments of this Court resolving various Motions filed. A trial was held on the remaining issues at which time the Court heard the statements of counsel, the testimony of witnesses and received documentary evidence. Upon consideration of the statements made, the evidence presented, the memoranda filed, the record in the case and the applicable law, the Court enters the following Memorandum Opinion.[1]

The Objection and Complaint herein was filed by the Trustee seeking two items of relief. First, the Trustee objected to the claim filed by the Internal Revenue Service ("IRS") against the bankruptcy estate, or rather, objected to its payment by the estate. Second, the Trustee sought to have a 50% interest in two promissory notes, the "Dorvin Notes", turned over to the estate because it has always been estate property or because a purported transfer by Debtor Albert Huddleston, was a simulation under state law. In a prior Opinion and Judgment, entered on June 6, 2001, the Court allowed the IRS Amended Proof of Claim against the estate, but de-

ferred ruling on the amount of that claim, further finding that the individual Defendants herein, the "Huddleston Children" were not liable for the IRS claim. The Opinion also found that there were questions of fact as to the turnover allegations and deferred those issues to the recent trial on the merits. Here, the Court rules on those two deferred matters.

With regard to the amount of the IRS claim, the evidence offered at trial consisted of the testimony of Brenda Esser, an IRS Revenue Officer, and the Certificate of Assessments and Payments regarding the estate tax return filed by Albert Huddleston ("Debtor"), as administrator for his first wife, Madeline Huddleston. The facts relating to the estate tax claim, along with the fiduciary fraud liability imposed against the Debtor, were discussed in some detail in this Court's prior Opinion and will not be recounted here. It will suffice to state that the original estate tax deficiency was in the amount of $345,147.00 and the fraud penalty was in the amount of $172,573.00. The Debtor and the Huddleston Children are jointly and severally liable under the Internal Revenue Code for both the original tax liability and the fraud penalty, the Debtor as a fiduciary and the Children as transferees.

However, as Esser testified to at the trial, the tax and fraud penalty were abated by seizures from and payments by the Huddleston Children. As is apparently its legal prerogative, the IRS chose to settle the Childrens' transferee liabilities after collecting what it considered were the maximum amounts that could be collected at the time. Notably, however, the is no evidence of a settlement with the youngest child, Alicia, although there has apparently

---

**1.** This Memorandum Opinion constitutes the Court's Findings of Fact and Conclusions of Law in accordance with Bankruptcy Rule 7052.

been a Stipulated Judgment entered into with her. Consequently, the IRS is left with the option of collecting the balance from the Debtor and, accordingly, this bankruptcy estate. This course of action is what the Court questioned in its previous Opinion, in view of the fact that further collection from most of the Children is time-barred under the Internal Revenue Code. However, after considering the testimony of Esser, and finding no contrary evidence, the Court must conclude that the IRS acted within the bounds of its discretion, though perhaps not as the Court would have preferred, in its collection efforts. Thus, the Court must find that, as presented in the exhibit offered at trial, the IRS holds an allowed claim against the estate in the amounts of $801,656.98 (priority), $116,774.05 (general unsecured) and $31,371.54 (administrative).

The majority of the testimony at trial dealt with the Trustee's turnover claim. This claim relates to the Dorvin Notes, which are two promissory notes executed on March 15, 1979 by Dorvin Developments, Inc. and Edwin C. Dorvin (collectively, "Dorvin") in favor of the Debtor during his marriage to the late Madeline Huddleston. The first note was in the original principal sum of $58,000.00 and the second note was in the principal sum of $296,000.00. These notes were a part of the community of acquets and gains of the Debtor and Madeline Huddleston. Until Madeline Huddleston's death on January 17, 1981, the notes were payable through a collecting agent, Bank of New Orleans, which received all proceeds and paid them one-half to the Debtor and one-half to Madeline Huddleston.

After Madeline Huddleston's death, the Debtor opened her succession and was named administrator of her estate. On July 2, 1981 and July 15, 1981, the Debtor

wrote Dorvin to change the collecting agent to Continental Titles, Inc. ("CTI"), a Defendant in this action and a company owned at least 50% by the Debtor. Thereafter, CTI received the note proceeds and deposited them into an account at First National Bank of Jefferson ("Whitney Account").[2] No other funds of CTI were deposited into this account because CTI maintained a separate account at Merchants Bank & Trust for its other receipts.

On or about May 13, 1987, the Debtor allegedly endorsed the back of the two Dorvin Notes "Pay to the order of Continental Titles". However, there is no credible evidence that there was any consideration given by CTI for the alleged transfer, although the Debtor maintains that the notes were a capital contribution to CTI. The books and records of CTI did not reflect such a contribution and, indeed, in a 1990 deposition given by the Debtor in an adversary proceeding brought by the Huddleston Children, the Debtor state that he did not know what consideration was given for the endorsement of the notes. Moreover, there is also no evidence that the Debtor ever relinquished possession of the notes. On January 29, 1988, Albert and Helene Huddleston ("Debtors") filed a Joint Petition for Relief under Chapter 11 of the Bankruptcy Code.

Most of the evidence at trial concerning the financial records of CTI and the Debtors came from Wayne Bienvenu, an examiner who prepared a Court-ordered report dated January 4, 1990 concerning the operations and finances of the Debtors and their related businesses, and from his report itself. CTI's balance sheets for the fiscal years ending May 31, 1987, May 31, 1988 and May 31, 1989 do not reflect the Dorvin Notes as assets, nor do they reflect

---

**2.** First National Bank of Jefferson was subsequently purchased by Whitney National Bank.

any interest income paid on the notes as income to the company. Rather, all payments received on the notes were applied on the CTI books to reduce the Debtor's outstanding shareholder loans to CTI. Bienvenu testified that the CTI cash receipts and disbursements records reveal that approximately $37,000.00 was deposited into and disbursed from the Whitney Account for the fiscal year June 1, 1988 through May 31, 1989. The primary source for these funds was the note payments. As in previous years, the payments were credited against the Debtor's shareholder loans.

While the disbursements from the Whitney Account were charged to the Debtor's shareholder loan account on CTI's books, in fact the disbursements were made for the benefit of the Debtor or his family or for the Debtors' residence on Chateau Magdelaine. The trial testimony of both of the Debtors supports this fact. Significantly, there is no evidence that any of the proceeds from the notes went to satisfy a single corporate obligation of CTI. In fact, the Articles of Incorporation for CTI do not authorize the company to acquire or hold for investment any securities, negotiable notes or mortgage notes. It could, however, act as an escrow agent to receive and disburse monies.

On April 10, 1990, the Debtors' case was converted to a Chapter 7 case. Prior to the conversion, the Huddleston Children instituted an adversary proceeding, referred to above, against the Debtors seeking turnover of certain property from the estate of Madeline Huddleston that they claimed belonged one-half to them. Pursuant to the Judgment entered by this Court in connection with that proceeding, the Court recognized that the Children were one-half owners of the Dorvin Notes. The Court made no finding regarding the ownership of the other one-half interest. During the pendency of the adversary proceeding, the law firm of Stone, Pigman, Walther, Whittmann & Hutchinson, L.L.P. ("Stone, Pigman"), began collecting all payments on the Dorvin Notes. Stone, Pigman has continued to collect all payments since that time, with the one-half not belonging to the Children being held in escrow.

In his deposition given in the Children's adversary proceeding, the Debtor testified that, beginning in July of 1981, he utilized CTI as a collecting agent for the Dorvin Notes and that he used the funds deposited in the Whitney Account for the benefit of the Huddleston Children or jointly-owned property. Also in the deposition, he stated that CTI had acquired "ownership" of the notes in May of 1987, but that he continued to place the funds in the Whitney Account and use them for the same purposes as previously done. As Bienvenu's report indicates, the Debtor was, up to that time, declaring the income interest from the Dorvin Notes on his personal income tax returns.

The evidence regarding the Debtor's previous transactions relating to his assets is illuminating. In 1979, he incorporated Continental Builders Supply, Inc. ("CBS") and, though he was the true owner, the stock was issued in the name of Michael Coons. Coons endorsed the stock of CBS back to the Debtor, but CBS' books do not reflect this. In his 1990 deposition, the Debtor states that this was done because it was better for dealing with vendors if someone other than he was the record owner of the company. In 1980, when his first wife was apparently planning divorce, the Debtor transferred the stock in CTI and other of his companies so that he would not be the record owner of the companies for purposes of any divorce proceedings. No consideration was given for any of these transfers. As aforementioned, when the Debtor was the

administrator for the estate of Madeline Huddleston, none of her interest in these companies was listed on the either the succession papers filed in state court or on the federal estate tax return.

Bienvenu's report outlines numerous questionable transfers and transactions undertaken by the Debtor pre-petition and post-petition that illustrate the Debtor's propensity for moving his assets around for his own purposes. For example, the report notes that certain real property was purportedly transferred in August of 1987 from Urban Redevelopments, Inc. ("Urban"), another of the Debtor's companies, to CTI for allegedly fair consideration. However, the report also notes that a counter-letter by CTI indicates that no funds changed hands in the transactions and that CTI has no interest in the properties. The accounting records of Urban still reflected ownership of the properties. Finally, this Court is fully aware, from the prior adversary proceeding, of the Debtor's attempts to hide the assets his Children inherited from their mother and continue to use them for his purposes.

CTI introduced certain evidence at trial that attempts to prove that the transfer to CTI was genuine and indeed was recognized as such by the former Trustee, Claude Smith, and the current Trustee. It is true that, after the conversion of the Debtors' case, Smith was a director, officer and shareholder of CTI. However, the CTI Corporate Resolution executed on August 31, 1993, and signed by Smith, only recognizes that the Debtor "notified" Dorvin on May 31, 1987 that CTI was the owner of the Dorvin Notes and that the Debtor had the authority to transfer his one-half interest in the notes. It does not, nor could it, conclusively state that the transfer was validly done. Indeed, at paragraph 5, the transfer is referred to as "purported". The Resolution actually serves to renounce

CTI's claim to The Huddleston Children's one-half interest in the notes and authorize Stone, Pigman to release the proceeds it has received and will receive to the Children.

Also, it is a fact Bienvenu acknowledged in his testimony at trial and in his report that he understood from the Debtor that it was his position that the transfer of the notes was a capital contribution to CTI. However, Bienvenu also noted in his report that, as of May 31, 1987, the Working Trial Balance of CTI did not reflect this capital contribution and that Huddleston subsequently directed his bookkeeper to review the records and that it was the bookkeeper's recommendation to adjust the books to reflect the capital contribution. Finally, CTI offers the evidence that the Debtors' schedules indicate that the Dorvin Notes were owned by CTI and that the Trustee report forms for 1999 and 2000 do not include the notes as an estate asset.

The Trustee seeks turnover of the Dorvin Notes and their proceeds under two theories. First, he contends that the notes never were anything other than property of Albert Huddleston and, thus, upon filing, property of the estate. Therefore, he merely seeks turnover of estate property from its custodian under 11 U.S.C. §§ 542 and 543. Alternatively, he seeks a declaration of the Court that the purported transfer of The notes in 1987 by the Debtor was a simulation under Louisiana state law and, thus, invalid. Because the Court finds that the transfer was a simulation, the issue of whether, under bankruptcy law, the Complaint herein is a turnover action or an avoidance action, as CTI maintains, with its attendant potential statute of limitations problems, need not be addressed.

Pursuant to La.C.C.art.2025, "[a] contract is a simulation when, by mutual

agreement, it does not express the true intent of the parties." A simulated sale occurs when the parties do not have the good faith intent to transfer ownership. *Wilson v. Progressive State Bank & Trust Company,* 446 So.2d 867 (La.App. 2nd Cir. 1984). Such a sale is a sham and, as a result, an absolute nullity. *Id.* Whether a transaction is a simulation is to be decided upon the facts and circumstances of each case. *Milano v. Milano,* 243 So.2d 876 (La.App. 1st Cir.1971). However, when the property allegedly sold remains in the possession of The seller, there is a presumption of a simulation. La.C.C.art. 2480. An action to annul a simulated sale is not prescriptable. *Manion v. Pollingue,* 524 So.2d 25 (La.App. 3rd Cir.1988); *Safford v. Ellish,* 276 So.2d 884 (La.App. 1st Cir.1973).

■ The facts in this case clearly indicate that the purported transfer by the Debtor of the Dorvin Notes to CTI was a simulation. While some writings, including the endorsement of the notes, may *seem* to support the intent to make the transfer, the other credible evidence belies this stated intent. Until, at the earliest the second half of 1989, the books and records of CTI do not reflect any consideration given for the transfer, do not reflect the notes as an asset of CTI and do not reflect interest income to CTI from the notes. Indeed, the corporate articles of CTI do not authorize it to acquire or hold notes for investment. The proceeds of the notes were deposited into an account from which the expenses of the Debtors and the Huddleston Children were paid, as the note proceeds had been used before the alleged transfer. No other funds paid to CTI were ever deposited into this account, nor were any expenses of CTI ever paid from the account. Payments received on the notes were applied on CTI's books to reduce the Debtor's shareholder loans.

The interest income from the notes was being declared by the Debtor on his income tax returns, at least until the time of Bienvenu's report. Perhaps most importantly, there is no evidence that the Debtor ever relinquished possession of the Dorvin Notes.

Also telling of the true intent of the Debtor regarding the "transfer" of the Dorvin Notes is the Debtor's own history, recited above, of manipulating so-called transfers to conceal and disguise his ownership of property from creditors and other third parties. Not only does this history establish a pattern of such actions, but it throws considerable doubt upon the credibility of the testimony of the Debtor regarding his intent in connection with the Dorvin Notes. The Debtor's intent is whatever the exigencies of the circumstances warrant, or what is sometimes referred to as "selective intent". Moreover, his deposition testimony outlined above is not supportive of his position with regard to the notes, perhaps because it was given at a time when it better served his purposes to take a different position regarding his many questionable transactions. Nonetheless, his highly suspect testimony does little to bolster the argument of CTI that it owns the notes when opposed by credible evidence to the contrary.

■ The Court does not find the Debtor's testimony regarding his intent credible. Nor does the Court find much support for the validity of the transfer in the other evidence offered by CTI. The fact that former Trustee Smith supposedly recognized the transfer is of no moment since it was after the fact and cannot change the legal nature of the transaction and also Smith was not authorized by the Court to make such a recognition. That the Debtors' bankruptcy schedules list the Dorvin Notes as assets of CTI is also far from conclusive, nor are the Trustee report

forms. In fact, there is nothing offered by CTI into evidence that sufficiently counters the great weight of evidence that points to the conclusion that the transfer of the Dorvin Notes by the Debtor in May of 1987 was a simulation and a sham and, thus, a nullity. Regarding the assertion of CTI that the Trustee's claims should be barred by the doctrine of laches because there is prejudice to CTI in the time period that has passed since the transfer, the Court finds no evidence of such prejudice and, therefore, will not apply laches.

In conclusion, the Court finds, first, that the claim of the IRS will be allowed in the following amounts: $801,656.98—priority; $116,774.05—general unsecured; and $31,371.54—administrative. The Court does not find, however, as the Trustee suggests, that the estate still holds claims of indemnity and contribution against the Huddleston Children for the tax liability. Those claims, including one against Alicia, have prescribed, as the Court found in the previous Opinion entered in this case. Second, the Court finds that it is proper to annul the May 1987 transfer of the Dorvin Notes to CTI as a simulation and declares that the undivided one-half interest in the notes that is not owned by the Huddleston Children is property of the Debtors' bankruptcy estate. An appropriate Judgment will be entered.

### JUDGMENT

For the reasons assigned in the foregoing Memorandum Opinion entered herein by the Court this date,

IT IS ORDERED, ADJUDGED AND DECREED that, on the Complaint filed by the Trustee, David Adler, judgment be, and it is hereby, ENTERED IN FAVOR OF THE TRUSTEE. The May 13, 1987 transfer by Debtor, Albert Huddleston, of two promissory notes, executed on March 15, 1979 in favor of the Debtor by Dorvin Developments, Inc. and Edwin Dorvin ("Dorvin Notes"), to Defendant, Continental Titles, Inc. ("CTI"), is hereby DECLARED TO BE A SIMULATION AND A NULLITY.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the estate of the Debtors be, and it is hereby, DECLARED THE OWNER OF THE UNDIVIDED ONE–HALF INTEREST IN THE DORVIN NOTES NOT OWNED BY THE HUDDLESTON CHILDREN. Such property, and the proceeds therefrom since the filing of the Debtors' bankruptcy, is ordered to be TURNED OVER TO THE TRUSTEE by CTI, the Debtors and Stone, Pigman, Walther, Whittmann and Hutchinson, L.L.P., or any other person or entity with possession or custody of the property, within two weeks of the date of entry of this Judgment.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Objection to Claim filed by the Trustee be, and it is hereby, OVERRULED. The Amended Proof of Claim filed by the Internal Revenue Service ("IRS") will be ALLOWED IN THE FOLLOWING AMOUNTS: $801,656.98 IN PRIORITY CLAIM; $116,774.05 IN GENERAL UNSECURED CLAIM; AND $31,371.54 IN ADMINISTRATIVE CLAIM.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants Meghan Huddleston Delgiorno, Lindsay Huddleston Kersker, Kevin Doyle Huddleston and Alicia St.John Huddleston, HAVE NO LIABILITY FOR THE AMENDED IRS CLAIM UNDER INDEMNITY OR CONTRIBUTION.